UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TIMOTHY REIF and DAVID FRAENKEL, as Co-Trustees of the LEON FISCHER TRUST FOR THE LIFE AND WORK OF FRITZ GRUNBAUM and MILOS VAVRA,

<em>Plaintiffs,</em>

-against-

REPUBLIC OF AUSTRIA, a foreign state, and the ALBERTINA MUSEUM, an agency of the REPUBLIC OF AUSTRIA, and LEOPOLD MUSEUM PRIVATE FOUNDATION, a foundation owned and controlled by the REPUBLIC OF AUSTRIA,

<em>Defendants.</em>

Index No.: 22-cv-10625

**VERIFIED COMPLAINT**

---

Plaintiffs, by and through their counsel, DUNNINGTON BARTHOLOW & MILLER LLP, hereby complain of the Defendants as follows:

<strong>PRELIMINARY STATEMENT</strong>

In 1954, the Second Circuit relieved the U.S. District Court of the Southern District of New York from all limitations on jurisdiction over claims from Holocaust victims and Nazi persecutees involving Nazi art looting in German territories from 1933 to 1945 based on a clearly-expressed U.S. foreign policy. *Bernstein v. N.V. Nederlandsche- Amerikaansche Stoomvart-Maatschappij*, 210 F.2d 375 (2d Cir. 1954). In furtherance of this clearly-expressed U.S. foreign policy, reaffirmed repeatedly since 1945, Congress passed the Holocaust Expropriated Art Recovery Act of 2016 ("the HEAR ACT") to extend the statute of limitations for claims to Nazi-looted art for claimants with possessory interests to six years from the date of actual discovery of the location of the artworks (or six years from December 16, 2016 in certain cases where the location of an artwork was known prior to the HEAR Act's passage). Public

Law 114-308-December 16, 2016. Congress did so for the following two specified purposes: "(1) To ensure that laws governing claims to Nazi-confiscated art and other property further United States policy as set forth in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration.  (2) To ensure that claims to artwork and other property stolen or misappropriated by the Nazis are not unfairly barred by statutes of limitations but are resolved in a just and fair manner."   The plain language of the HEAR Act and its legislative history and how that Congress meant the HEAR Act to apply extraterritorially to give Holocaust victims a U.S. forum to resolve their claims.

This action seeks recovery of twelve artworks ("the Artworks") by the artist Egon Schiele stolen by the Nazi regime from the Jewish cabaret artist Franz Friedrich "Fritz" Grünbaum while he was imprisoned in the Dachau Concentration Camp from 1938 until his death in 1941. Article 26 of the Austrian State Treaty of 1955 required --- and still requires --- Austria to return all property stolen from Nazi persecutees and forbids Austria from acquiring such property. Despite this treaty obligation and numerous public diplomatic commitments to provide a forum for Holocaust victim families to recover looted artworks, Austria has failed to do so and has, in this failure, become a haven for traffickers in Nazi looted art.  Austrian courts have effectively slammed the courthouse doors shut by imposing impossible financial barriers to claimants. Here, because Plaintiffs are impecunious and because the Artworks are believed to be tremendously valuable, proceeding with claims in Austria would be futile and impossible as demonstrated in *Altmann v. Austria,* 541 U.S. 677 (2004).  But Plaintiffs need not prove that Austria is an inconvenient forum or show federal question jurisdiction to resolve this controversy in this court.  Because most of the Artworks were trafficked through New York at a time that

they belonged to the Grünbaum Heirs residing in New York, New York's long-arm statute provides for jurisdiction and a remedy under New York law.

Despite due demand, and despite overwhelming evidence that the Artworks were stolen from Grünbaum by the Nazi regime in violation of international law, Austria has refused to return the Artworks which are today in the wrongful possession of the the ALBERTINA MUSEUM and the Leopold Museum Private Foundation ("the LEOPOLD MUSEUM") both of which are owned by the REPUBLIC OF AUSTRIA.

There being no other recourse, Plaintiffs allege as follows:

## THE STOLEN ART COLLECTION – A BRIEF OVERVIEW

1.      Under Article 26 of the Austrian State Treaty of 1955, it is unlawful for Defendants to retain artworks obtained through forced transfer because of racial or religious discrimination during the Nazi regime.

2.      Article 26 of the Austrian State Treaty of 1955 provides as follows:

**Property, Rights and Interests of Minority Groups in Austria**

1. In so far as such action has not already been taken, Austria undertakes that, in all cases where property, legal rights or interests in Austria have since 13th March, 1938 been subject of forced transfer or measures of sequestration, confiscation or control on account of the racial origin or religion of the owner, the said property shall be returned and the said legal rights and interests shall be restored together with their accessories. Where return or restoration is impossible, compensation shall be granted for losses incurred by reason of such measures to the same extent as is, or may be, given to Austrian nationals in general in respect of war damage.

2. Austria agrees to take under its control all property, legal rights and interests in Austria of persons, organisations or communities which, individually or as members of groups, were the object of racial, religious or other Nazi measures of prosecution where, in the case of persons, such property, rights and interests remain heirless or unclaimed for six months after the coming into force of the present Treaty, or where in the case of organisations and communities such organisations or communities have ceased to exist. Austria shall transfer such property, rights and interests to appropriate agencies

3

or organisations to be designated by the Four Heads of Mission in Vienna by agreement with the Austrian Government to be used for the relief and rehabilitation of victims of persecution by the Axis Powers. It being understood that these provisions do not require Austria to make payments in foreign exchange or other transfers to foreign countries which would constitute a burden on the Austrian economy. Such transfer shall be effected within eighteen months from the coming into force of the present Treaty and shall include property, rights and interests required to be restored under paragraph 1 of this Article.

3.      As will be explained in greater detail below, Fritz Grünbaum's art collection of over 440 artworks was stolen from him from his apartment in Vienna, Austria, following the March 13, 1938 Nazi entry into Austria ("the Anschluss").

4.      A 1925 Würthle Gallery catalogue documents 22 of Grünbaum's Schieles ("Würthle __"). **Exhibit A.**

5.      1928 correspondence between Otto (Nirenstein) Kallir and Grünbaum documents additional Schieles in Grünbaum's collection ("the 1928 Correspondence" or "1928 Corr. ___"). **Exhibit B.**

6.      A 1930 catalogue raisonné of Schiele's oils authored by Otto (Nirenstein) Kallir documents Grünbaum's ownership additional works, including, significantly, *Dead City III.*

7.      A Nazi inventory compiled by Franz Kieslinger shows that Grünbaum owned 81 artworks by the artist Egon Schiele, including five oils listed by name including *Dead City III.* **Exhibit C.**

8.      As reflected in a decision by the Appellate Division, First Department, in *Reif v. Nagy,* 175 A.D.3d 107 (1st Dept. 2019), based on the testimony of Swiss art dealer Eberhard Kornfeld and testimony of Schiele expert Jane Kallir, all of the 53 works sold in a 1956 sale at the art gallery Gutekunst & Klipstein in Berne, Switzerland (today Galerie Kornfeld) came from Grünbaum's collection.

9.      The 1956 Gutekunst & Klipstein sale was documented by a catalogue ("the Kornfeld Catalogue").  **Exhibit D.**

10.     Additionally, Eberhard Kornfeld provided Swiss journalist Thomas Buomberger a list of works from Grünbaum's collection.  **Exhibit E.** ("Buomberger List at ___").

11.     Below are images, titles and the Kornfeld Catalogue number of each of the Artworks and citations to the 1925 Würthle Catalogue, 1928 Correspondence as appropriate, together with the current locations.  "JK" numbers refer to entries in Kallir, Jane, *Egon Schiele: The Complete Works* (Harry Abrams 1990 & 1998).

12.     *Dead City III* (1911), Kornfeld Catalogue number 1.  JK P.213.  1928 Corr.  1925 Würthle 11. Buomberger List. LEOPOLD MUSEUM.



13.     *Self-Portrait with Grimace* (1910) Kornfeld Catalogue number 5.  JK D.705. 1925 Würthle 45. Buomberger List. LEOPOLD MUSEUM.



14.     *Standing Man In Red Shawl* (1913) Kornfeld Catalogue number 26. JK D.1420.

1928 Corr. 17.  1925 Würthle 78. Buomberger List. LEOPOLD MUSEUM.



15.     *Red Blouse* (1913) Kornfeld Catalogue number 28.  JK D.1394. Buomberger List.

LEOPOLD MUSEUM.



16.     *Embracing Nudes* (1914) Kornfeld Catalogue number 35. JK D. 1606.

Buomberger List. LEOPOLD MUSEUM.



17.     *Intertwined Nudes* (1912) JK. D.1147.  Buomberger List. LEOPOLD MUSEUM.



18.    *Seated Girl With Yellow Cloth* (1913) JK D.1278. Kornfeld Catalogue number

106.  Buomberger List. LEOPOLD MUSEUM.



19.    *Devotion* (1912) JK D.1418. 1928 Corr. 9.  Buomberger List. LEOPOLD

MUSEUM.



20.    *Standing Girl With Orange Stockings* (1914) JK D.1488. Kornfeld November 24,

1955 Catalogue number 108. 1928 Corr. 1. Buomberger List. LEOPOLD MUSEUM.



21.    *Aunt and Nephew* (1915) JK D.1797. Kornfeld Catalogue number 37. 1925

Würthle 112. Buomberger List. ALBERTINA MUSEUM.



22.    *Self-Portrait as Penitent* (1911) JK D.942.  Kornfeld Catalogue number 15.

Buomberger List. LEOPOLD MUSEUM.



23.    *Seated Female Nude on Red Drape* (1914) JK D.1504. Kornfeld November 24, 1955 Catalogue number 107. Buomberger List. ALBERTINA MUSEUM.



**THE PARTIES**

24.    Plaintiffs are co-heirs of the estate of Grünbaum, a Viennese Jewish cabaret performer (born in Brno, Moravia) who was arrested by the Gestapo on March 22, 1938,

imprisoned in the Dachau Concentration Camp, despoiled of all of his property by the Nazi regime, and murdered in Dachau on January 14, 1941.

25.     Plaintiffs Reif and Fraenkel are co-trustees of the testamentary Leon Fischer Trust for the Life and Work of Fritz Grünbaum (the "Fischer Trust"), a trust located in New York County and hold valid letters of trusteeship representing the late Leon Fischer's 50% ownership interest in Grünbaum's estate.

26.     The Fischer Trust's assets are insufficient to post the costs that would be required for this proceeding to be brought before an Austrian court.

27.     Plaintiff Reif is a resident of the County, City and State of New York.

28.     Plaintiff Fraenkel is a resident of the State of Florida.

29.     Plaintiff Vavra is a resident of the Czech Republic who owns a 50% interest in Grünbaum's estate.

30.     The Fischer Trust's assets are insufficient to post the costs that would be required for this proceeding to be brought before an Austrian court.

31.     Defendant REPUBLIC OF AUSTRIA is a foreign state, as defined in 28 U.S.C. § 1603(a).

32.     Defendant ALBERTINA MUSEUM is an art museum located at Albertinaplatz 1010 Wien in Vienna, Austria.

33.     After 1955, the ALBERTINA MUSEUM became an agency and instrumentality of the REPUBLIC OF AUSTRIA, owned and operated by the REPUBLIC OF AUSTRIA.  From 1938 to 1945, the ALBERTINA MUSEUM was operated by Nazi Germany.

34.     The REPUBLIC OF AUSTRIA asserts ownership of all of the artworks in the ALBERTINA MUSEUM, including the Artworks.

35.     The LEOPOLD MUSEUM PRIVATE FOUNDATION ("the LEOPOLD MUSEUM") is a foundation created in 1994 that is wholly owned, controlled and financed by the REPUBLIC OF AUSTRIA.

36.     The REPUBLIC OF AUSTRIA acquired the LEOPOLD MUSEUM through a purchase from Rudolf Leopold for 2.2 billion Austrian shillings paid from 1994 through 2007 financed by the REPUBLIC OF AUSTRIA and the Austrian National Bank.

### JURISDICTION AND VENUE

37.     This Court has subject-matter jurisdiction and personal jurisdiction over the REPUBLIC OF AUSTRIA, the ALBERTINA MUSEUM and the LEOPOLD MUSEUM under 28 U.S.C. §1330 because these are claims raising questions of federal law as to which none of these parties is entitled to immunity under 28 U.S.C. § 1605-7 (the Foreign Sovereign Immunities Act ("FSIA")) for the acts of Nazi-era German officials looting artworks from a concentration camp inmate before murdering him. *Bernstein v. N.V. Nederlandsche- Amerikaansche Stoomvart-Maatschappij*, 210 F.2d 375 (2d Cir. 1954); *Republic of Austria v. Altmann,* 317 F.3d 954, *modified* 327 F.3d. 1246 (9th Cir. 2003), *affirmed* 541 U.S. 677 (2004).

38.     This Court also has diversity jurisdiction under 28 U.S.C. §1332 because the property claims arise under New York law and the amount in controversy exceeds $75,000.  This Court also has jurisdiction under 28 U.S.C. 1331 because the action arises under federal law.

39.     This action concerns rights in property expropriated in violation of international law, namely the Artworks that were taken from Fritz Grünbaum after March 1938 by a power of

attorney Grünbaum was forced to execute under penalty of death in the Dachau Concentration Camp.  After the Second World War, the REPUBLIC OF AUSTRIA, the ALBERTINA MUSEUM and the LEOPOLD MUSEUM withheld the Artworks from Grünbaum's heirs, despite due demand for their return in furtherance of the violations of international law committed by the Nazis.

40.     Certain of the Artworks are in the possession of the ALBERTINA MUSEUM and the LEOPOLD MUSEUM, agencies and instrumentalities of the REPUBLIC OF AUSTRIA that operates these museums.

41.     The ALBERTINA MUSEUM is engaged in commercial activity in the United States.

42.     The ALBERTINA MUSEUM and LEOPOLD MUSEUM engage in and receive the benefit of tourist advertising in the United States conducted by the official Austrian National Tourist Office, a non-profit agency sponsored and controlled by the REPUBLIC OF AUSTRIA, which has offices in various cities in the United States, including an office in New York.  This advertising often features the LEOPOLD MUSEUM's famous collection of paintings by Egon Schiele, which is comprised in substantial part by the looted artworks that are the subject of this action.

43.     The ALBERTINA MUSEUM and the LEOPOLD MUSEUM are visited by thousands of United States citizens each year, and accept entrance fees from these visitors.  The Artworks that are the subject of this action are some of the main attractions of the museums.  In its gift shop, the LEOPOLD MUSEUM sells memorabilia, including numerous images of the looted artworks at issue in this action, to U.S. citizens.  The LEOPOLD MUSEUM accepts payment by U.S. credit cards for these purchases.

13

44. The LEOPOLD MUSEUM has in the past also loaned artworks, including, upon information and belief, at least one of the works at issue in this action, *Dead City III,* to museums in the United States, and receives reciprocal benefits thereby.

45. In sum, the ALBERTINA MUSEUM and LEOPOLD MUSEUM use the looted artworks at issue in this action for commercial activities directed at U.S. citizens, including citizens of New York, New York.

46. The REPUBLIC OF AUSTRIA is engaged in numerous other commercial activities in the United States.

47. Venue is proper in this District under 28 U.S.C. § 1391 (f)(1) because a substantial number of the Artworks were wrongfully removed from New York County in violation of the property rights of one or more New York residents in the estate of Fritz Grünbaum within this judicial district.

48. The following five artworks were acquired by Defendants after Otto Kallir (the then-New-York-based proprietor of Galerie St. Etienne on 57th Street in New York County) purchased the works in Switzerland and brought them to New York: 1. *Dead City III* JK P.213; 2. *Grimacing Self-Portrait* JK D.705; 3. *Standing Man Draped In Red Shawl* JK D.1420; 4. *Red Blouse* JK D.1394; 5. *Embracing Nudes* JK D.1606.

49. Venue is proper in this District under 28 U.S.C. § 1391(f)(3) because the REPUBLIC OF AUSTRIA, the ALBERTINA MUSEUM and the LEOPOLD MUSEUM conduct business in this district. Austria is not a feasible venue for this action because the Austrian courts require payment of fees in proportion to the amount in controversy. In this case, those fees far exceed the value of Plaintiffs' assets.

14

## THIS COURT'S JURISDICTION OVER NAZI ART LOOTING

50.     This court has jurisdiction to pass on the validity of acts of Nazi officials as set

forth in *Bernstein v. N.V. Nederlandsche- Amerikaansche Stoomvart-Maatschappij*, 210 F.2d

375 (2d Cir. 1954), because the Executive branch has clearly expressed its policy that the federal

courts should exercise jurisdiction over such controversies and the Second Circuit has relieved

the district court of "all restraints based on the inability of the court to pass on acts of officials in

Germany during the period in question." *Id.* at 376.

51.     From 1938 until 1945, the present Republic of Austria was part of the German

Reich.

52.     In relieving the Southern District of New York of all limitations on its

jurisdiction, the Second Circuit relied on Press Release No. 296 of April 27, 1949, and a letter

from Jack B. Tate, Acting Legal Advisor, Department of State:

> Jurisdiction of United States Courts Re Suits for Identifiable Property
> Involved in Nazi Forced Transfers.' The substance of this Release follows:
>
> 'As a matter of general interest, the Department publishes herewith a copy
> of a letter of April 13, 1949 from Jack B. Tate, Acting Legal Advisor,
> Department of State, to the Attorneys for the plaintiff in Civil Action No.
> 31-555 in the United States District Court for the Southern District of New
> York.
>
> 'The letter repeats this Government's opposition to forcible acts of
> dispossession of a discriminatory and confiscatory nature practiced by the
> Germans on the countries or peoples subject to their controls; states that it
> is this Government's policy to undo the forced transfers and restitute
> identifiable property to the victims of Nazi persecution wrongfully deprived
> of such property; and sets forth that the policy of the Executive, with respect
> to claims asserted in the United States for restitution of such property, is to
> relieve American courts from any restraint upon the exercise of their
> jurisdiction to pass upon the validity of the acts of Nazi officials.'
>
> The letter from Mr. Tate is then quoted, pertinent parts of which follow:
>
> '1. This Government has consistently opposed the forcible acts of
> dispossession of a discriminatory and confiscatory nature practiced by the
> Germans on the countries or people subject to their controls. * * *

'3. The policy of the Executive, with respect to claims asserted in the United States for the restitution of identifiable property (or compensation in lieu thereof) lost through force, coercion, or duress as a result of Nazi persecution in German[y], is to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.'

*Id.* at 376.

53.     This Court has jurisdiction over this controversy and may resolve claims for restitution of the Artworks under the authority of the HEAR Act and under *Bernstein.*

54.     Under *Bernstein,* the acts of German officials in plundering occupied territories and robbing and murdering the Jewish population were not and are not subject to sovereign immunity.

55.     The REPUBLIC OF AUSTRIA, as a nation, is forbidden from acquiring Nazi looted art under Article 26 of the Austrian State Treaty of 1955.

56.     As reflected in the legislative history of the HEAR Act, the United States has maintained a consistent policy of undoing acts of Nazi spoliation of Jewish Holocaust victims since World War II.

57.     From late 1956, many of the Artworks were located in New York County in the possession of the Galerie St. Etienne on 57th Street.

58.     From late 1956 until around 1966, Grünbaum's heirs were entitled to possession and all right, title and interest in and to the Artworks which were part of Grünbaum's estate.

59.     At the time of the transfers one or more of Grünbaum's heirs resided in New York County and, today, a charitable testamentary trust created by the deceased Leon Fischer continues to be situated in New York County.

60.     Without any right, title or interest in the Artwork, and without conducting a reasonable provenance inquiry that would have shown that the Artwork belonged to New York

residents, Rudolf Leopold, Otto Kallir, or other agents of Defendants tortiously caused Galerie
St. Etienne to transport the Artwork outside New York County.

61.     Because this tort occurred in New York County and involved the rights to a
decedent's property held by one of more residents of New York County, this court has long arm
jurisdiction over this controversy under Section 302 of the New York Civil Practice Law and
Rules.

62.     Because this controversy seeks declaratory relief and involves the rights of a
decedent's estate held by residents of New York to sue for a stolen chattel, this court has
jurisdiction to grant declaratory relief and exercise jurisdiction over non-domiciliaries for this
"chose in action" involving a chattel located outside New York for the reasons set forth in *Estate
of Stettiner,* 148 A.D.3d 184 (1st Dept. 2017).

63.     Venue is also proper because the REPUBLIC OF AUSTRIA the ALBERTINA
MUSEUM and the LEOPOLD MUSEUM conduct business in this district.  Austria is not a
feasible venue for this action because the Austrian courts require payment of fees in proportion
to the amount in controversy.  In this case, those fees far exceed the value of Plaintiffs' assets.

### ALLEGATIONS SUPPORTING PLAINTIFFS' STANDING

64.     On July 16, 1938, Nazis forced Grünbaum to sign a power of attorney in the
Dachau Concentration Camp permitting his wife Elisabeth to liquidate his assets and hand the
assets over to the Nazi regime.  **Exhibit F** at 3 (true copy of the power of attorney ("Vollmacht")
(including a certified English translation)).

65.     From 1938 to 1939, Elisabeth was forced to liquidate Fritz's assets pursuant to
Nazi decrees.

66.     On Grünbaum's death (in the Dachau Concentration Camp where he was imprisoned), a Vienna notary certified that Fritz had no property, there was nothing left. **Exhibit G** at 3 (true copy of the notary's certification).

67.     On October 5, 1942, Elisabeth was deported to the Maly Trostinec death camp in Minsk, where she was murdered.

68.     Elisabeth Grünbaum's June 1939 Jewish Property Declaration shows that all of her property had been taken by the Nazis before she was murdered. **Exhibit H** (true copy of Elisabeth's Jewish Property Declaration (including a certified English translation); *see* **Exhibit H** at 3, 28 (stamped "Erledigt" ["done" or "completed"] and "Gesperrt" ["closed"]).

69.     As explained more fully below, these documents show conclusively that the Grünbaums lost Grünbaum's art collection prior to their deaths.

70.     Austrian government records demonstrate that no Grünbaum family member could have legally recovered the art collection following the deaths of Fritz and Elisabeth Grünbaum.

71.     Austrian government records show that from 1941 until 2002 Grünbaum had no heirs appointed by an Austrian court and no Austrian decrees of distribution were issued.

72.     Under Austrian law, for a family member to transfer a decedent's assets, that family member must first be declared an heir and receive a decree of distribution.

73.     Thus, the lack of any heirship or distribution decrees from 1941 until 2002 in Austrian government files signifies, as a matter of law, that no family member could have taken title to Grünbaum's art collection, or title to any individual artworks belonging to Grünbaum.

74.     Pursuant to a Certificate of Heirship issued by the District Court Innere Stadt Vienna dated September 12, 2002, Leon Fischer ("Fischer") and Milos Vavra ("Vavra") were

each declared an heir of Fritz Grünbaum's estate entitled to an undivided fifty percent (50%) share. **Exhibit I** (true copy of the Certificate of Heirship).

75.      In 1998, District Attorney Robert Morgenthau's Office seized Grünbaum's *Dead City III* after it was exhibited at the Museum of Modern Art in New York City in 1997-1998. Prior to that seizure, neither Fischer nor Vavra had any idea that Grünbaum's art collection survived World War II.

76.      Upon learning of the art collection's existence, Fischer and Vavra diligently pursued Grünbaum's art collection.

77.      Pursuant to a last will and testament dated February 2012, Fischer appointed Reif and Fraenkel as executors of his estate.

78.      Fischer died on August 16, 2013.

79.      Letters testamentary were issued to Reif and Fraenkel and Fischer's will was duly probated.

80.      Fischer's will created the Leon Fischer Trust for the Life and Work of Fritz Grünbaum (the "Fischer Trust") to pursue Grünbaum's artworks with proceeds going to charity.

81.      Reif and Fraenkel are now co-trustees of the Fischer Trust and hold valid letters of trusteeship.

## ALLEGATIONS SUPPORTING RECOVERY OF THE STOLEN ARTWORKS

82.      On April 26, 1938, the Nazi regime decreed all Jewish property in excess of 5,000 Reichsmarks ("RM") to be available to the Nazi Reich for Field Marshal Goering's Four Year Plan to build the Nazi war machine.

83.      The April 26, 1938 decree required all Jews with property in excess of 5,000 RM to declare their assets quarterly until the assets were gone or until the Jews left the Reich.

84.     Jews were forbidden to transfer declared property, including art, without permission from Nazi authorities.

85.     As part of the process of securing Jewish assets to prevent transfers or sales, the Jewish Property Transaction Office (Vermögensverkehrsstelle) of Vienna commissioned inventories and valuation reports.   The Jewish victims were charged a fee for this process.

86.     A Vermögensverkehrsstelle inventory thus signified that Jewish assets were secured by the Nazi government.  Pursuant to that process, the Vermögensverkehrsstelle commissioned Franz Kieslinger, an expert of the Dorotheum, to inventory Grünbaum's art collection while Grünbaum was in the Dachau Concentration Camp in 1938.

87.     The Kieslinger Inventory is part of the Elisabeth and Fritz Grünbaum Jewish Property files maintained in the Austrian State Archives. **Exhibit C** at 3, 14-16, 27, 40-43 (true copy of Fritz Grönbaum's July 16, 1938 Jewish Property Declaration, which declares the art collection and includes the Kieslinger Inventory).

88.     The Dorotheum was a Nazi-controlled auction house in Vienna used by the Nazi regime to sell art plundered from Jews and turn the proceeds over to the Nazi Reich.

89.     The Kieslinger Inventory shows Grönbaum's art collection to be valued at 5,791 RM.  **Exhibit C** at 16, 42.

90.     Grönbaum's art collection contained at least 81 works by the artist Egon Schiele.

91.     The stamps "Erledigt" ["done" or "completed"] and "Gesperrt" ["closed" or "blocked"] were official Nazi stamps indicating that the property of the Jewish person in question had been spoliated.

92.     Fritz's Jewish Property Declaration bears "Erledigt" and "Gesperrt" stamps. **Exhibit C** at 17, 43.

93.     Because the art collection was inventoried and described in the Jewish Property Declarations, the "Erledigt" and "Gesperrt" stamps demonstrate conclusively that the Nazis stole Fritz Grünbaum's art collection.

94.     In November and December 1938, surrounding the Kristallnacht pogrom, the Nazis passed additional laws to steal Jewish property and to forbid Jews from engaging in property transactions without Nazi approval.

95.     One of the laws provided for "Aryan" trustees to be appointed to liquidate Jewish property.

96.     All proceeds from sales or transfers of Jewish property went to the Nazi Reich, with commissions to the Aryan trustees.

97.     Some time prior to January 1939, Vienna attorney Ludwig Rochlitzer was appointed Aryan trustee of the "property of the Grünbaums."  **Exhibit J** (a true copy of a January 31, 1939 letter from Rochlitzer to Elisabeth announcing Rochlitzer's appointment as Aryan trustee for the Grünbaum property, together with certified English translation).

98.     From the time of Rochlitzer's appointment as Aryan trustee, neither Fritz nor Elisabeth had access to Fritz's art collection.

99.     Grünbaum never voluntarily abandoned his art collection during his lifetime.

**U.S. State Department Warns U.S. Museums, Colleges And Art Dealers Against Acquiring Potentially Stolen Artworks From Europe In Highly Publicized Campaign, Thus Putting The World On Notice**

100.     Following World War II, Nazi looting of artworks from Jewish victims received tremendous media attention in the United States.

101.    Following World War II, the U.S. State Department put out bulletins to museums, universities, art dealers and others urging U.S. citizens to be vigilant against acquiring Nazi-looted artwork and asking for assistance in returning stolen art.

102.    Media and government efforts put the art and museum community on heightened notice that acquiring artworks that were in Europe after 1933 and created prior to 1946 without complete provenances could indicate that the artworks had been acquired as a result of Nazi persecution.

103.    Accordingly, any U.S. person acquiring artworks that were in Europe after 1933 and created prior to 1946 without complete provenances cannot be prejudiced by the inaction of a Holocaust victim family in seeking to recover artworks stolen by Nazis because that U.S. person should have exercised vigilance prior to and after acquiring the artwork.

104.    The REPUBLIC OF AUSTRIA, ALBERTINA MUSEUM and LEOPOLD MUSEUM were on inquiry notice prior to acquiring the Artworks that the Artworks might be stolen and failed to exercise appropriate diligence in acquiring the Artworks or to make reasonable efforts to ascertain the true owners of the Artworks prior to taking possession.

105.    New York law protects the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value. *Solomon R. Guggenheim Found. v. Lubell,* 77 N.Y.2d 311, 317-18 (1991)

106.    New York places the burden of investigating the provenance of a work of art on the potential purchaser in furtherance of discouraging the trade in stolen art. *Solomon R. Guggenheim Found. v. Lubell,* 77 N.Y.2d 311, 320-21 (1991).

**Grünbaum's Art Collection Surfaces In Switzerland In 1956**

107.    Ten of the Artworks are featured in a 1956 Gutekunst & Klipstein sales catalogue

of Egon Schiele's artworks as number 4. **Exhibit D (**a true copy of the 1956 Gutekunst &

Klipstein Schiele sale catalogue, with certified English translation) at 17.

108.    Two of the Artworks, JK D.1488 *Standing Girl With Orange Stockings* and JK

D.1504 *Female Nude Seated on Red Drape, Back View* are featured in a November 24, 1955

Gutekunst & Klipstein sales catalogue.  **Exhibit K.**

109.    JK D.1488 *Standing Girl With Orange Stockings* is identified in the 1928

correspondence as belonging to Grünbaum.

110.    JK D.1504 *Female Nude Seated on Red Drape, Back View* is traced to the

Grünbaum collection through the Buomberger List.  **Exhibit E.**

111.    All artworks in the 1956 Gutekunst & Klipstein sales catalogue were stolen from

Grünbaum, including the famous *Dead City III*, which was seized by the District Attorney

Robert Morgenthau from the Museum of Modern Art in New York City in 1998.  *Reif v. Nagy,*

175 A.D.3d 107 at 110, 114, 121.

**Bakalar Sues The Grünbaum Heirs Using Fabricated Evidence To Extinguish Rights In
Grünbaum's Art Collection**

112.    In 2005, Fischer and Vavra were sued by David Bakalar, a Massachusetts resident

who sought to extinguish their rights in an Egon Schiele drawing stolen from Grünbaum titled

*Seated Woman with Bent Left Leg* in an action captioned *Bakalar v. Vavra.*

113.    Bakalar had sought to auction *Seated Woman With Bent Left Leg* at Sotheby's in

New York and London.

114.    In doing so, Bakalar promoted the false story that Grünbaum's sister-in-law Mathilde Lukacs obtained Grünbaum's art collection and sold it to Swiss art dealer Eberhard Kornfeld in 1956.

115.    The "Mathilde Lukacs" story, first floated in 1998 by Eberhard Kornfeld after *Dead City III's* seizure, has long been derided by Holocaust scholars as implausible because Lukacs was herself imprisoned in Belgium during World War II after escaping Vienna.

116.    Bakalar succeeded in excluding as untimely both an expert report of historian Dr. Jonathan Petropoulos debunking the Mathilde Lukacs provenance and an expert report on Czech law of Dr. Milan Kostohryz showing that the Vavra line of heirs was persecuted and trapped behind the Iron Curtain in Communist Czechoslovakia.

117.    Because of these exclusions of key evidence and because Eberhard Kornfeld denied the Grünbaum Heirs' handwriting expert access to handwriting samples of Mathilde Lukacs that would have demonstrated forgeries, the *Bakalar v. Vavra* case was not fully or fairly litigated.

118.    In 2006, the Southern District of New York denied Fischer's and Vavra's request to amend the pleadings to permit them to pursue additional artworks owned by Fritz Grünbaum. *Bakalar v. Vavra,* 237 F.R.D. 59 (S.D.N.Y. 2006).

119.    From 2005 to 2012, Fischer and Vavra unsuccessfully sought in *Bakalar v. Vavra* to assert a possessory interest in *Seated Woman with Bent Left Leg*.

120.    Following a bench trial, the district court concluded that Bakalar could not establish by a preponderance of the evidence that Grünbaum voluntarily relinquished possession of the drawing or that he did so intending to pass title.  *Bakalar v. Vavra,* 819 F.Supp.2d 293, 300 (S.D.N.Y. 2011).

121.     The district court further found that Mathilde Lukacs did not acquire valid title to the drawing.  819 F.Supp.2d 293 at 302-303.

122.     Despite Bakalar's inability to prove legal title, the Hon. William Pauley determined that inactions of predecessors-in-interest of Leon Fischer and Milos Vavra extinguished possessory rights of the Grünbaum Heirs, as against Bakalar, a Massachusetts purchaser who purchased an artwork in New York from Otto Kallir of Galerie St. Etienne, who had in turn purchased *Seated Woman with Bent Left Leg* from the 1956 Gutekunst & Klipstein sale together with 18 other Schiele artworks, including *Dead City III.*   819 F.Supp.2d 293, 305 (S.D.N.Y. 2011).   The district court invoked the doctrine of laches to reach this result.  The court applied laches in a manner inconsistent with the approach of New York common law courts to applying the equitable doctrine of laches and in a manner inconsistent with public policy protecting true owners of stolen artworks.

123.     On October 11, 2012, the Second Circuit Court of Appeals, in a summary (non-precedential) order, affirmed Judge Pauley's decision by finding it not clearly erroneous. *Bakalar v. Vavra*, 500 Fed.Appx. 6 (2d Cir. 2012).

124.     In doing so, the Second Circuit mistakenly relied on a fabricated version of the Grünbaum Heirs' case offered by the plaintiff that was nowhere contained in the record and --- when raised for the first time on appeal by plaintiff ---- had been vigorously contradicted by Vavra and Fischer.   *Bakalar v Vavra*, 500 Fed Appx. 6, 7-8 (2d Cir. 2012) ("Vavra and Fischer's hypothesis—that the Nazis stole the Drawing from Grunbaum only to subsequently return or sell it to his Jewish sister-in-law—does not come close to showing that the district court's finding was clearly erroneous.").

125.    To underscore, neither Vavra nor Fischer ever argued that Nazis returned or sold artworks to Mathilde Lukacs (and the record contained no evidence to support this manufactured narrative).

126.    To the contrary, from the first pleadings, Vavra and Fischer argued that the story that Mathilde Lukacs sold Grünbaum's art collection to Gutekunst & Klipstein was entirely a fabrication.

127.    Also from the first pleadings, Vavra and Fischer argued that even if, assuming arguendo, the Mathilde Lukacs story were true, Lukacs would not have had good title, which, in turn, meant that she could not have given good title to Bakalar.

128.    In *Matter of Flamenbaum*, 22 N.Y.3d 962, 966 (2013), decided after *Bakalar*, clarified that, in the context of missing testimony relevant to a laches defense, the proponent of the defense must show that the missing evidence would have been relevant to establishing legal title.  ("although the decedent's testimony may have shed light on how he came into possession of the (artwork), we can perceive of no scenario whereby the decedent could have shown that he held (good) title").

**In The Wake Of *Bakalar*, And Prior to *Reif v. Nagy*, Three Art Dealers Conspired To Strip German Lost Art Database (www.lostart.de) of Grünbaum Claims**

129.    During the course of the *Bakalar* litigation, Grünbaum's heirs were criticized for not having registered search requests related to Grünbaum's art collection on the Lost Art Database located at www.lostart.de.

130.    Accordingly, Vavra and Fischer registered "search requests" based on the Kieslinger inventory and other pre-World War II material to artworks that appeared circumstantially to fit the description of artworks lost by Grünbaum.

131.    Below is the Lost Art Database's description of what "search requests" are:

26

Lost Art Database

The Lost Art Database documents cultural property expropriated as a result of Nazi persecution, especially from Jewish owners, between 1933 and 1945 ("Nazi-looted art"), or for which such a loss cannot be ruled out. With the help of the publication of so-called Search Requests and Found-Object Reports, former owners or their heirs are to be brought together with current owners and thus support all stakeholders in finding a just and fair solution.

The Lost Art Database also contains reports on cultural property that was removed as a result of the Second World War ("trophy art"). Their publication is intended to support solutions in accordance with international law. The Lost Art Database is accessible worldwide free of charge. www.lostart.de/en/start

132.    On September 23, 2015, German attorney Jutta von Falkenhausen wrote to the Lost Art Database on behalf of Galerie Kornfeld Verlag AG (Bern) represented by Christine Stauffer, Galerie St. Etienne (New York) represented by Jane Kallir, and Richard Nagy Ltd. (London) represented by Richard Nagy. **Exhibit L** (true copy of von Falkenhausen's letter).

133.    Relying on *Bakalar v. Vavra* and on Austrian decisions that, in turn, relied on *Bakalar v. Vavra* and the fabricated "Mathilde Lukacs" story, von Falkenhausen demanded that the Lost Art Database delist certain of the Grünbaum heirs' claims.

134.    Von Falkenhausen's request included Schiele's *Dead City III* and the *Red Blouse*, both of which are located at the Leopold Museum in Vienna.  **Exhibit M** at 12.

135.    Over the Grünbaum Heirs' objections, the Lost Art Database erased the Grünbaum Heirs' claims, in particular, the claims relating to artworks in the 1956 Gutekunst & Klipstein Schiele sale.

136.     Today, if one types in the name "Grünbaum" on the Lost Art database one will find a number of requests.  Under "status" it states "This announcement is contradicted by third parties."  **Exhibit N** (Mountain Landscape (Farmhouse in the Tirol) Lost art-ID 478864).  On August 26, 2018, the New York Times reported on the dispute between the Grünbaum Heirs and

the Lost Art Database in the article by William Cohan: *Jewish Heirs Take on an Art Foundation That Rights Nazi Wrongs* **Exhibit O**. https://www.nytimes.com/2018/08/26/arts/design/nazi-art-egon-schiele-fritz-grunbaum.html.

### *Reif v. Nagy* Debunks Fabricated Mathilde Lukacs Provenance

137.    In November 2015, shortly after learning that two other Egon Schiele artworks from the 1956 Gutekunst & Klipstein sale catalogue (*Woman Hiding Her Face* and *Woman In Black Pinafore*) were displayed by London art dealer Richard Nagy at the Park Avenue Armory, Reif, Fraenkel and Vavra commenced *Reif v. Nagy* in the New York State Supreme Court, New York County.

138.    The Supreme Court, Ramos, J., after carefully considering expert testimony from Dr. Petropoulos and Dr. Kostohryz that had been excluded in the *Bakalar* case, granted summary judgment on the plaintiffs' replevin and conversion claims.  *Reif v. Nagy,* 61 Misc.3d at 330, 80 N.Y.S.3d at 367.

139.    Justice Ramos found that the Nazis confiscated Fritz Grünbaum's artworks by forcing him to sign the power of attorney to his wife, who was herself later murdered by the Nazis, and that the act of signing the power of attorney was involuntary: "[a] signature at gunpoint cannot lead to a valid conveyance." *Id.,* 61 Misc.3d at 326, 80 N.Y.S.3d at 634.

140.    In affirming, the Appellate Division, First Department, determined that the power of attorney the Nazis forced Fritz to execute in favor of Elisabeth while Fritz was imprisoned in Dachau was not voluntarily executed, "reject[ing] the notion that a person who signed a power of attorney in a death camp can be said to have executed the document voluntarily." *Reif v. Nagy,* 175 A.D.3d 107, 129, 106 N.Y.S.3d 5, 21 (First Dept. 2019).

141.    The First Department concluded Elisabeth was never able to convey good title. 175 A.D.3d at 129, 106 N.Y.S.3d at 21.

142.    The First Department determined that Grönbaum's art collection "never legally left Austria." 175 A.D.3d at 111.

143.    The First Department also determined that the art collection was in Austria on June 30, 1939, after Grönbaum's sister-in-law Mathilde Lukacs had fled Vienna for Belgium. 175 A.D.3d at 112.

144.    Unlike the *Bakalar* court, *Reif v. Nagy* carefully analyzed the historical circumstances and rejected decisively the arguments that Grönbaum's sister-in-law Mathilde Lukacs had laundered Grönbaum's artworks through Switzerland.

145.    The Appellate Division carefully analyzed overwhelming evidence suggesting that Mathilde Lukacs never had custody of the art collection, and certainly lacked custody during the War when she was imprisoned.

146.    The Appellate Division further noted:

> We note that there are no records, including invoices, checks, or receipts documenting that the Artworks were purchased by Kornfeld from Mathilde. Moreover, even if Mathilde had possession of Grunbaum's art collection, possession is not equivalent to legal title.

*Id.* at 127.

147.    The First Department also analyzed record evidence not available to the *Bakalar* court, such as post-*Bakalar* revelations involving Eberhard Kornfeld's dealings with Cornelius Gurlitt and Kornfeld's trafficking of other Nazi-looted artworks.

148.    Thus, *Reif v. Nagy's* factual findings are based on a developed factual record and supercede the factual record in *Bakalar*, further making *Bakalar* an untrustworthy precedent.

149.     In affirming, the First Department determined that Reif, Frankel and Vavra had "superior ownership and possessory interests" in the Schiele artworks relative to Nagy.  *Id.,* 175 A.D.3d at 132, 106 N.Y.S.3d at 24.

150.     Unlike *Bakalar, Reif v. Nagy* rejected the proposition that the decedent Mathilde Lukacs's missing testimony could have prejudiced Nagy because "Mathilde could not have shown she had good title to the artworks and her testimony would not have been probative." 175 A.D.3d 107 (1st Dept. 2019).

151.      In rejecting Nagy's "prejudice" argument, *Reif v. Nagy* relied on the New York Court of Appeals 2013 decision clarifying that the proponent of the laches defense must show that a decedent's missing testimony would have supported a claim of title.  *Matter of Flamenbaum*, 22 N.Y.3d 962, 966 (2013).

152.     *Reif v. Nagy's* trustworthy application of *Matter of Flamenbaum* constitutes an intervening change or clarification of law that further renders the *Bakalar* precedent unreliable.

153.     Because Nagy refused to return the artworks, the Appellate Division affirmed an award of prejudgment interest in the amount of $700,964.44.  *Reif v. Nagy,* 199 A.D.3d 616, 158 N.Y.S.3d 89 (1st Dept. 2021).

154.     Nagy persisted in challenging the Heirs' possessory interest in artworks stolen from Grünbaum until the Court of Appeals' May 24, 2022 denial of Nagy's motion for leave to appeal.  *Reif v. Nagy,* 38 N.Y.3d 908, 168 N.Y.S.3d 720 (2022).

155.     The Court of Appeals' May 2022 decision established a possessory interest in Grünbaum's heirs under New York law to artworks stolen from Fritz Grünbaum, by the Nazis, such as the Artworks.

156.    Because the Grünbaum Heirs had no possessory interest in the Artworks clearly recognized by New York law prior to May 24, 2022, the present claims to the Artworks are timely under the HEAR Act.

**Schieles Stolen From Grünbaum Featured in 1956 Gutekunst & Klipstein Sales Catalogue**

157.    Many of the Artworks are featured in a 1956 Gutekunst & Klipstein Sales catalogue of Egon Schiele's artworks.

158.    All artworks in the 1956 Gutekunst & Klipstein sales catalogue were stolen from Grünbaum, including the famous *Dead City III*, which was seized by District Attorney Robert Morgenthau from the Museum of Modern Art in New York City in 1998. *Reif v. Nagy,* 175 A.D.3d 107 at 110, 114, 121 (1st Dept. 2019).   The Gutekunst & Klipstein sales catalogue made no mention of Mathilde Lukacs in the provenance of the artworks.

159.    In the 1997 Museum of Modern Art Catalogue:   *"Egon Schiele: the Leopold collection, Vienna, Texts by Magdalena Dabrowski and Rudolf Leopold* (Yale University Press), the provenance of *Dead City III* (1911) appears as follows (with no mention of Mathilde Lukacs):



Arthur Roessler, Vienna; Alfred Spitzer, Vienna; Fritz Grünbaum, Vienna; Gutekunst & Klipstein, Bern, Galerie St. Etienne, New York; Rudolf Leopold, Vienna.   **Exhibit M** at 144.



160.    In the 1997 Museum of Modern Art Catalogue:  *"Egon Schiele : the Leopold collection, Vienna, Texts by Magdalena Dabrowski and Rudolf Leopold* (Yale University Press), the provenance of *Red Blouse ("Rote Bluse")* (1913) appears as follows (with no mention of Mathilde Lukacs): Fritz Grunbaum, Vienna; Heirs of Fritz Grunbaum, The Netherlands; Galerie Kornfeld, Bern (auction), 1981; Rudolf Leopold, Vienna. **Exhibit M** at 220.

### CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION – REPLEVIN

161.    Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein.

162.    As set forth above, the Artworks were stolen from Fritz Grünbaum while he was in the Dachau Concentration Camp.

163.    The REPUBLIC OF AUSTRIA, ALBERTINA MUSEUM and LEOPOLD MUSEUM unlawfully acquired possession of the Artworks and have refused to return them to the Grünbaum heirs.

164.    Plaintiffs have a right of ownership to the Artwork.

165.     Defendants caused one or more of the Artworks to be removed from New York County without the knowledge or consent of the Plaintiffs or their predecessors-in-interest.

166.     The removal of artworks from New York County was a tortious act in derogation of the Plaintiffs' rights under New York law.

167.     Plaintiffs have diligently searched for the Artwork.

168.     A replevin cause of action is timely under the HEAR Act.

169.     Replevin is warranted under both New York law and federal law because New York law provides for long arm jurisdiction over non-domiciliaries committing a tort in New York County.

170.      Replevin is also warranted under the doctrine set forth in *Bernstein.*

171.     Plaintiffs have been damaged by the deprivation of their property and are entitled to either a recovery of the property or payment of their interest in the paintings, the value of which will be subject to proof at trial, together with costs and interest.

## AS AND FOR A SECOND CAUSE OF ACTION – DECLARATORY JUDGMENT (28 U.S.C. 2201)

172.     Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein.

173.     Due to the unlawful and tortious removal of one or more of the Artworks from New York County without the knowledge or consent of the Plaintiffs or their predecessors-in-interest, a dispute has arisen between Plaintiffs, the REPUBLIC OF AUSTRIA, the ALBERTINA MUSEUM and the LEOPOLD MUSEUM concerning the Artworks.

174.     A declaratory judgment is warranted under both New York law and federal law because New York law provides for long arm jurisdiction over non-domiciliaries committing a tort in New York County.

175.     The HEAR Act and the *Bernstein* exception also give this court jurisdiction over the controversy and the relief requested.

176.     Pursuant to a law enacted by the REPUBLIC OF AUSTRIA in December 1998, all artworks which were objects of restitution after the War and which were donated to the ALBERTINA MUSEUM in connection with a request for export permits, or were never properly restituted and were subsequently obtained by the ALBERTINA MUSEUM or LEOPOLD MUSEUM, must be returned to their original owners of their heirs.  Thus, New York law does not conflict with Austrian law and the issues in this case are ripe for declaratory relief.

177.     Wherefore Plaintiffs pray for a declaration affirming ownership of the Artworks, resolution of these issues will allow the Heirs to obtain restitution of the Artworks from the REPUBLIC OF AUSTRIA, the ALBERTINA MUSEUM and the LEOPOLD MUSEUM. Additionally, the United States has the ability under its treaty with Austria to enforce the judgment of this Court declaring that the Heirs are entitled to restitution of the Artworks and restoring the Artworks to the possession of the Grünbaum Heirs.

178.     Therefore, Plaintiffs request a declaratory judgment that the Artworks are the property of Plaintiffs, together with costs and interest.

## AS AND FOR A THIRD CAUSE OF ACTION – IN THE ALTERNATIVE - FOR DAMAGES FOR VIOLATION OF INTERNATIONAL LAW

179.     Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein, in the alternative should the Court decide that the first and second causes of action fail to state a claim.

180.     The REPUBLIC OF AUSTRIA, the ALBERTINA MUSEUM and the LEOPOLD MUSEUM violated international law by knowingly participating in and/or profiting from the Nazi persecution of Fritz Grünbaum as set forth above.

181.   As determined by the United States Congress passing the HEAR Act to provide a private right of action in U.S. courts and in TITLE II of the Holocaust Victims Redress Act of 1998, the above referenced actions by the ALBERTINA MUSEUM were in violation of numerous international treaties, customary international laws, and fundamental human rights laws prohibiting war crimes, including, or as reflected by the United Nations Charter, the Universal Declaration of Human Rights, the Geneva Convention of 1929, the supplemental Geneva Convention of the Treatment of Non-Combatants During World War Time, the Nuremberg Principles, the Covenant on Civil and Political Rights, the Hague Convention of 1907, and the Austrian State Treaty of 1955.

182.   As a result of the above referenced violations of international law, Plaintiffs have suffered injury and are entitled to judgment against the REPUBLIC OF AUSTRIA, the ALBERTINA MUSEUM and the LEOPOLD MUSEUM on this cause of action for compensatory damages in an amount to be determined by the court.

### AS AND FOR A FOURTH CAUSE OF ACTION – FOR RESTITUTION BASED ON UNJUST ENRICHMENT

183.   Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein, in the alternative should the Court decide that the first and second causes of action fail to state a claim.

184.   As described above, the REPUBLIC OF AUSTRIA, ALBERTINA MUSEUM and LEOPOLD MUSEUM have been unjustly and unlawfully enriched at the expense of the heirs of Fritz Grünbaum.

185.   As a result of the ALBERTINA MUSEUM's and LEOPOLD MUSEUM's unjust enrichment, Plaintiffs are entitled to restitution of the Artworks to them, or the reasonable value thereof, together with interest.

**WHEREFORE,** Plaintiffs demand: (1) on the first cause of action, judgment providing for the return of the Artworks together with costs and interest; (2) on the second cause of action, a declaratory judgment that Plaintiffs own the Artworks together with costs and interest; (3) in the alternative should the Court determine that the first and second causes of action fail to state a claim, on the third alternative cause of action, damages in violation of international law together with costs and interest; (4) on the fourth alternative cause of action, in the alternative should the court determine that the first and second causes of action fail to state a claim, restitution or the value of the Artworks based on unjust enrichment together with costs and interest and (5) such other and further relief the Court deems just, proper and equitable.

Dated: New York, New York
         December 15, 2022

                                        Respectfully submitted,


                                        **DUNNINGTON BARTHOLOW & MILLER
                                        LLP**
                                        *Attorneys for Plaintiffs*


                                        By:  _/s/ Raymond J. Dowd_____
                                                 Raymond J. Dowd
                                                 Claudia G. Jaffe
                                                 230 Park Avenue 21st Floor
                                                 New York, New York 10169
                                                 Telephone: 212-682-8811
                                                 Facsimile: 212-661-7769
                                                 rdowd@dunnington.com
                                                 cjaffe@dunnington.com

## VERIFICATION

TIMOTHY M. REIF, affirms, subject to penalties of perjury under the laws of the State of New York as follows:

1. I am a plaintiff in this action and an attorney admitted to practice in the State of New York.

2. I have read the foregoing Complaint with exhibits, know the contents thereof and the same are true and correct to my own knowledge, except where alleged upon information and belief, and with respect to those allegations, I believe them to be true.

3. The grounds of my belief as to all matters not stated to upon my knowledge are documents, papers and data contained in the files pertaining to this matter.

December 14, 2022

_____
TIMOTHY M. REIF