UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TIMOTHY REIF, *et al.*,

Plaintiffs,

v.

REPUBLIC OF AUSTRIA, *et al.*,

Defendants.

Case No. 22-cv-10625 (JGK)

**BRIEF FOR *AMICI CURIAE* UNITED STATES SENATORS RICHARD BLUMENTHAL AND JOHN CORNYN**

## TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICI CURIAE* ........ 1
SUMMARY OF ARGUMENT ........ 1
HISTORICAL BACKGROUND ........ 2
I. The Nazis' wartime theft of artwork and the Allies' response ........ 3
II. Adoption of U.S. national policy supporting restitution ........ 5
III. Enactment of the HEAR Act of 2016 to facilitate restitution ........ 8
IV. Courts continued to dismiss claims without reaching the merits ........ 9
V. Congress responds by amending the HEAR Act ........ 9
ARGUMENT ........ 10
I. The HEAR Act does not violate the Tenth Amendment ........ 10
A. The HEAR Act is a valid exercise of Congress' enumerated powers ........ 12
B. The HEAR Act does not implicate the anticommandeering doctrine ........ 17
II. The HEAR Act does not violate separation-of-powers principles ........ 18
A. The HEAR Act changes applicable law; it does not prescribe an outcome in any given case ........ 19
B. Elimination of equitable defenses does not breach separation of powers ........ 19

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*,
593 U.S. 67 (2021)....25

*Bakalar v. Vavra*,
619 F.3d 136 (2d Cir. 2010)....10, 22

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016)....24

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
596 U.S. 107 (2022)....11, 15

*Cassirer v. Thyssen-Bornemisza Foundation*,
89 F.4th 1226 (9th Cir. 2024)....15

*Corley v. United States*,
11 F.4th 79 (2d Cir. 2021)....18

*Dice v. Akron, C & Y.R. Co.*,
342 U.S. 359 (1952)....18

*Est. of Kainer v. UBS AG*,
37 N.Y.3d 460 (2021)....15

*Federal Republic of Germany v. Philipp*,
592 U.S. 169 (2021)....21

*Felder v. Casey*,
487 U.S. 131 (1988)....18

*Freier v. Westinghouse Elec. Corp.*,
303 F.3d 176 (2d Cir. 2002)....21

*Gonzales v. Raich*,
545 U.S. 1 (2005)....21, 22

*Grupo Mexicano de Desarrollo v. All. Bond Fund*,
527 U.S. 308 (1999)....25

*Hamilton v. Kentucky Distilleries and Warehouse Co.*,
251 U.S. 146 (1919)....19

*Lichter v. United States*,
334 U.S. 742 (1948)....19

*Murphy v. National Collegiate Athletic Association*,
584 U.S. 453 (2018)....................23

*New York v. United States*,
505 U.S. ....................16, 17, 23

*Plaut v. Spendthrift Farm, Inc.*,
514 U.S. 211 (1995)....................24, 25

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946)....................25

*Printz v. United States*,
521 U.S. 898 (1997)....................23

*Robertson v. Seattle Audubon Soc.*,
503 U.S. 429 (1992)....................24

*Stewart v. Kahn*,
78 U.S. 493 (1870)....................19, 21

*The Detroit Inst. of Arts v. Ullin*,
No. 06-10333, 2007 WL 1016996 (E.D. Mich. March 31, 2007) ....................12

*Torres v. Texas Dept. of Public Safety*,
597 U.S. 580 (2022)....................19

*United States v. Clay*,
128 F.4th 163 (3d Cir. 2025) ....................22

*United States v. Lopez*,
514 U.S. 549 (1995)....................21, 22

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
897 F.3d 1141 (9th Cir. 2018) ....................13, 15, 18

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ....................10, 13, 18

*Woods v. Cloyd W. Miller Co.*,
333 U.S. 138 (1984)....................19, 20

*Zuckerman v. Metro. Museum of Art*,
928 F.3d 186 (2d Cir. 2019). ....................15

**STATUTES**

Anti-Injunction Act, 28 U.S.C. § 2283 ....................26

HEAR Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524 (2016) ........................................ passim

HEAR Act of 2025, Pub. L. No. 119-8, 140 Stat. 752 (2026) ............................................. passim

Holocaust Victims Redress Act of 1998, Pub. L. 105-158, 112 Stat. 15 (1998) ...........................12

Nazi War Crimes Disclosure Act, Pub. L. No. 105-246, 112 Stat. 1859 (1998) ...........................12

Norris-LaGuardia Act, 29 U.S.C. §§ 101-115 .....................................................................26

Prison Litigation Reform Act, 18 U.S.C. § 3626 ..................................................................26

Tax Injunction Act, 28 U.S.C. § 1341 ...............................................................................26

**OTHER AUTHORITIES**

162 Cong. Rec. H5865 (Sep. 22, 2016) ..........................................................................14, 21

172 Cong. Rec. H2497 (Mar. 16, 2026) ...............................................................................20

Am. Comm'n for the Prot. & Salvage of Artistic & Historic Monuments in War Areas, Report (1946) ..........................................................................................................................9

Cath Pound, *The Nazi Hoard That Shocked the World*, BBC Culture (Dec. 13, 2017) ................10

Eleanor Gartstein, *Eighty Years Later: Progress of Nazi-Era Restitution Remains Inconsistent*, Harv. Int'l L. J. Online (Mar. 2025) ..........................................................................11

*Hearing on S. 2763, The Holocaust Expropriated Art Recovery Act Before the S. Comm. On the Judiciary, Subcomm. On the Constitution and Subcomm. On Oversight, Agency Action, Federal Rights, and Federal Courts*, 114th Cong. 1 (2016)...............................................9, 11

Jennifer A. Kreder & Virginia L. Schell, *The Constitutionality of the HEAR Act: Empowering American Courts to Return Holocaust-Era Artwork and Honor History*, 30 Depaul J. Art, Tech. & Intell. Prop. L. 1 (2020). ..........................................................................10

John Harrison, *Federal Power and Federal Equity Without Federal Equity Powers*, 97 N.D. Law Rev. 1911 (2022).........................................................................................25

*Monuments Men*, Nat'l Museum of the U.S. Army, https://www.thenmusa.org/articles/monuments-men/ .........................................................9

*Nazi-Era Looted Art Research and Restitution*, It's Art Law, https://itsartlaw.org/nazi-era-looted-art-research-and-restitution/ ...........................................................................22

Ralph E. Lerner & Judith Breser, *Art Law: The Guide for Collectors, Investors, Dealers, & Artists 4th Edition*, New York: Practicing Law Institute (2012) ............................................22

*S. 2763, the Holocaust Expropriated Art Recovery Act – Reuniting Victims with Their Lost Heritage: Hearing on S. 2763 Before the Subcomms. On the Constitution and on Oversight, Agency Action, Federal Rights and Federal Courts of the S. Comm. On the Judiciary*, 114th Cong. (2016) ....................20

S. Rep. No. 114-394 (2016) ....................14, 20

U.S. Const. amend. X....................16

U.S. Const., Art. I, § 8 ....................16, 17, 18, 23

U.S. Dep't of State, *Prague Holocaust Era Assets Conference: Terezin Declaration* (June 30, 2009) ....................13

U.S. Dep't of State, *Washington Conference Principles on Nazi-Confiscated Art* (Dec. 3, 1998) ....................11, 12

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae*, Senators Richard Blumenthal and John Cornyn, are Members of the United States Senate who sponsored the Holocaust Expropriated Art Recovery Act of 2016 and the 2025 amendments thereto.[1] As sponsors of the HEAR Act, Senators Blumenthal and Cornyn are deeply committed to the national and international policies furthered by the Act and have an interest in ensuring that the Court has a complete and accurate understanding of the Act's historical context and constitutional underpinnings. That interest is heightened by Defendants' challenge to the Act's constitutionality, including on the grounds that the Act is an impermissible encroachment on powers the Tenth Amendment reserves to the states.[2]

## SUMMARY OF ARGUMENT

The Holocaust Expropriated Art Recovery ("HEAR") Act of 2016, as amended in 2025 and codified in a note to 22 U.S.C. §1621, HEAR Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524 (as amended by Pub. L. No. 119-82, 14 Stat. 752 (2026)), is a valid exercise of Congress' enumerated powers, including its powers with respect to war and the regulation of foreign and interstate commerce. It neither violates the Tenth Amendment nor offends separation-of-powers principles. In furtherance of international undertakings by the United States, and in support of longstanding national policy to facilitate the restitution of property taken by force or otherwise

[1] No counsel for a party authored this brief, in whole or in part. No party or party's counsel contributed money to fund the preparation or submission of this brief. No person contributed money to fund the preparation or submission of this brief. Counsel for *amici curiae* prepared this brief *pro bono.*

[2] Although the pending motion to dismiss was filed jointly by all named Defendants, the Leopold Museum did not join in the portion of the supporting brief arguing that the HEAR Act is unconstitutional. *See* MTD at 11 n.6. Nonetheless, for clarity and simplicity, this brief will use "Defendants" to refer to the parties challenging the constitutionality of the HEAR Act.

under duress during the Holocaust, the HEAR Act establishes an actual-discovery limitations rule and precludes certain state law time-based and other non-merits defenses to claims to recover Nazi-confiscated art. The Act does not compel conduct by state governments or their officials—and therefore does not implicate powers the Tenth Amendment reserves to the states—nor does it intrude on the judicial function by directing the outcome of particular cases. Rather, it is an ordinary instance of federal preemption in exercise of powers constitutionally assigned to the federal legislature to accomplish a policy objective that is distinctly national in nature.

## HISTORICAL BACKGROUND

At its core, the HEAR Act seeks to ensure that claims to recover Nazi-confiscated art are heard on their merits and not frustrated by dismissal for non-merits reasons, such as the passage of time, *forum non conveniens*, and the act of state doctrine, among others. As the Act's findings explain, this solution was necessitated by "[t]he unique and horrific circumstances of World War II and the Holocaust." HEAR Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524 (as amended by Pub. L. No. 119-82, 14 Stat. 752 (2026)) (hereinafter "HEAR Act"), § 2(6).

The historical record demonstrates both the need and the constitutional basis for the Act: (1) the national policy interest and diplomatic undertaking to remediate an enduring consequence of World War II; (2) the failure of existing legal mechanisms to accomplish that remediation; and (3) the necessity of federal action after courts had held that states' attempts to provide remedies—*e.g.*, by relaxing otherwise applicable limitations periods—were unconstitutional, given the federal government's exclusive authority in matters related to war and foreign relations.

## I. The Nazis' wartime theft of artwork and the Allies' response

As part of their campaign to eradicate the Jewish people and their culture, the Nazis engaged in the systematic seizure of Jewish property, including art by some of the most celebrated artists in the world. The Nazis accomplished this mass dispossession through various means, including "legal" confiscation, looting, pillaging, duress-sales, and destruction. The resulting loss encompassed more than just the financial value of the artwork: the Jewish people were deprived of symbols of their heritage and prized family heirlooms.[3]

In response to this extensive plundering, the Allies—led by the United States—issued the Inter-Allied Declaration against Acts of Dispossession Committed in Territories under Enemy Occupation and Control (the "London Declaration") of January 5, 1943, which declared their intention to "defeat the methods of dispossession practiced . . . against the countries and peoples who have been so wantonly assaulted and despoiled." *Multilateral Declaration on Forced Transfers of Property in Enemy Controlled Territory*, 3 Bevans 754 (1943). Shortly thereafter, the United States established the Monuments, Fine Arts, and Archives (MFAA) Program to begin the work of reclaiming Nazi-stolen art. *Monuments Men*, Nat'l Museum of the U.S. Army, https://www.thenmusa.org/articles/monuments-men/ (last visited August 18, 2026). Although these initial efforts led to the recovery and preservation of thousands of works of art, many of the works recovered were returned to governments,[4] not to the individuals from whom they had been stolen or their heirs, and many remain missing or are still awaiting restitution. *See id.*

---

[3] *See The Holocaust Expropriated Art Recovery Act – Reuniting Victims with Their Lost Heritage: Hearing on S. 2763, The Holocaust Expropriated Art Recovery Act Before the S. Comm. On the Judiciary, Subcomm. On the Constitution and Subcomm. On Oversight, Agency Action, Federal Rights, and Federal Courts*, 114th Cong. 1 (2016) (testimony by Dame Helen Mirren).

[4] *See* Am. Comm'n for the Prot. & Salvage of Artistic & Historic Monuments in War Areas, Report at 148 (1946).

The sheer volume of stolen artwork, combined with the systematic destruction of records, the murder of owners and witnesses, and the disorder of wartime displacement, made tracing individual works incredibly difficult. *See* HEAR Act § 2(1), (6); Jennifer A. Kreder & Virginia L. Schell, *The Constitutionality of the HEAR Act: Empowering American Courts to Return Holocaust-Era Artwork and Honor History*, 30 Depaul J. Art, Tech. & Intell. Prop. L. 1, 10 (2020). Over time, those challenges have been compounded by others, including the deaths of pre-war owners and their immediate heirs and the complexities of inheritance laws across multiple jurisdictions. *See, e.g.*, *Bakalar v. Vavra*, 619 F.3d 136, 138–39 (2d Cir. 2010) (describing attempt to trace possession of disputed drawing from its pre-war owner to current possessor across several countries).

Though several European countries established special claims commissions through which pre-war owners or their heirs could attempt to reclaim their property, those commissions were largely ineffective. *See* Kreder, *supra* at 10. Provenance records, bills of sale, associated correspondence, inventory lists, and other documentation were destroyed, falsified, scattered, or archived,[5] inhibiting efforts by pre-war owners and their heirs to piece together their ownership claims. *See* HEAR Act § 2(6); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 958 (9th Cir. 2010) ("Tracking the provenance of Nazi-looted art is nearly impossible, since many changes of ownership went undocumented, and most of the transactions took place on the

[5] Sometimes even the artworks themselves were placed into storage or otherwise concealed, making it impossible for pre-war owners and their heirs to determine whether their lost artwork had even survived at all, let alone locate the documentation necessary to prove rightful ownership. *See, e.g.*, Cath Pound, *The Nazi Hoard That Shocked the World*, BBC Culture (Dec. 13, 2017), https://www.bbc.com/culture/article.20171212-the-nazi-art-hoard-that-shocked-the-world (describing the discovery of significant trove of art—including Nazi-looted works—in an apartment in Munich, Germany in 2012).

black market.") (citing Michael J. Bazyler, Holocaust Justice: The Battle for Restitution in America's Courts 202, 204 (NYU Press 2003)). Moreover, international property and succession laws made tracing and proving ownership all the more difficult, particularly when the pre-war owner had died intestate, because claimants would have to establish succession across international borders. *See, e.g.*, *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 110–12 (2022) (tracing succession impacting claim to Nazi-confiscated art). Further complicating these tracing efforts, in the decades following the war, museums, private collectors, and governments continued to trade in Nazi-confiscated art, treating the dubious legal status of their activities as nothing more than a "dirty secret."[6]

## II. Adoption of U.S. national policy supporting restitution

In 1998, forty-four countries—led by the United States—convened The Washington Conference on Holocaust Era Assets, which produced the first international agreement pertaining to the restitution of Nazi-confiscated art. *See* Eleanor Gartstein, *Eighty Years Later: Progress of Nazi-Era Restitution Remains Inconsistent*, Harv. Int'l L. J. Online (Mar. 2025), https://journals.law.harvard.edu/ilj/2025/03/eighty-years-later-progress-of-nazi-era-restitution-remains-inconsistent/. The Washington Conference issued eleven principles, reflecting the consensus that art confiscated by the Nazis and not yet restituted should be identified and publicized, and "steps should be taken expeditiously to achieve a just and fair solution." U.S. Dep't of State, *Washington Conference Principles on Nazi-Confiscated Art* (Dec. 3, 1998), https://www.state.gov/washington-conference-principles-on-nazi-confiscated-art. Nations were

[6] *The Holocaust Expropriated Art Recovery Act—Reuniting Victims with Their Lost Heritage: Hearing on S. 2763 The Holocaust Expropriated Art Recovery Act Before the S. Comm. On the Judiciary, Subcomm. On the Constitution and Subcomm. on Oversight, Agency Action, Federal Rights and Federal Courts*, 114th Cong. 1 (2016) (statement by Ronald S. Lauder).

"encouraged to develop national processes to implement these principles . . . ." *Id.* Congress subsequently enacted the Holocaust Victims Redress Act of 1998, Pub. L. 105-158, 112 Stat. 15, which expressed Congress' view that "all governments should undertake good faith efforts to facilitate the return of private and public property, such as works of art, to the rightful owners in cases where assets were confiscated from the claimant during the period of Nazi rule and there is reasonable proof that the claimant is the rightful owner." Section 202, Pub. L. 105-158, Stat. 17-18. The Holocaust Victims Redress Act thus established the United States' commitment to the return of Nazi-looted artwork, but it stopped short of establishing any official mechanism to support this commitment. Several months later, Congress passed the Nazi War Crimes Disclosure Act, which initiated the declassification of millions of pages of records related to Nazi war crimes and the disposition of looted assets. *See* Nazi War Crimes Disclosure Act, Pub. L. No. 105-246, 112 Stat. 1859 (1998). The subsequent declassification effort eventually gave many pre-war owners and their heirs access to critical evidentiary leads, allowing them to begin to piece together documentary support for their restitution claims. *See* Gartstein, *supra* p. 8.

In the decade following the Washington Conference, victims and their heirs turned to U.S. courts, but their efforts to recover Nazi-looted artwork were largely unsuccessful, not because the underlying ownership claims lacked merit, but because procedural obstacles stood in their way. One significant obstacle was state statutes of limitation pertaining to conversion and replevin claims, which typically bar such claims after a few years from either the date of the loss or the date when the claim should have been discovered. In some cases, these rules meant that claims to recover stolen art were time-barred before World War II even ended. *See, e.g., The Detroit Inst. of Arts v. Ullin*, No. 06-10333, 2007 WL 1016996, at *3 (E.D. Mich. March 31, 2007).

In June 2009, the United States reconfirmed its commitment to the restitution of Nazi-confiscated art when it joined with 45 other nations in issuing the "Terezin Declaration," which,

in consideration of "the experience acquired since the Washington Conference," urged "all stakeholders to ensure that their legal systems or alternative processes . . . facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims . . . ." U.S. Dep't of State, *Prague Holocaust Era Assets Conference: Terezin Declaration* (June 30, 2009), https://www.state.gov/prague-holocaust-era-assets-conference-terezin-declaration. The Terezin Declaration expressed the United States' and other countries' commitment to resolve claims for restitution of Nazi-confiscated art on their merits, and, in conjunction with the Washington Conference Principles, made restitution a matter not just of U.S. domestic policy, but also U.S. foreign policy.

Before Congress could act on this commitment, the U.S. Court of Appeals for the Ninth Circuit invalidated a California law extending the state statute of limitations for claims to recover Nazi-confiscated art, reasoning that it infringed on the foreign affairs powers reserved by the Constitution exclusively to the federal government. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 957 (9th Cir. 2010), *cert denied*, 546 U.S. 1037 (2011). The court determined that "[t]he recovery of Holocaust-era art affects the international art market, as well as foreign affairs[,]" and absent specific authorization from the federal government, "states are prohibited from exercising foreign affairs powers, including modifying the federal government's resolution of war-related disputes." *Von Saher*, 592 F.3d at 967–68 (quoting *Deutsch v. Turner Corp.*, 324 F.3d 692, 714 (9th Cir. 2003)). Because the federal government had given no such authorization, California lacked the power to enact the special statute of limitations for Nazi-looted art claims. *Id.* The *Von Saher* decision left a legislative vacuum that only Congress could fill.

**III. Enactment of the HEAR Act of 2016 to facilitate restitution**

In 2016, Congress attempted to fill that vacuum when it enacted the HEAR Act, which revived certain otherwise time-barred restitution claims and established a six-year, actual-discovery limitations rule, preempting conflicting state bars. *See* HEAR Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524. In introducing the bill that would become the HEAR Act (H.R. 6130), its House sponsor cited as its constitutional basis, among other powers, "article I, section 8, clause 3, which gives Congress the authority to regulate commerce with foreign nations and among the states." 162 Cong. Rec. H5865 (Sep. 22, 2016) (Constitutional Authority Statement for H.R. 6130).

The Senate Judiciary Committee explained that one of the primary obstacles impeding the merits-based resolution of restitution claims was "procedural hurdles such as statutes of limitations that prevent the merits of claims from being adjudicated." S. Rep. No. 114-394, at 5 (2016) (quoting *Von Saher*, 592 F.3d at 958). The Committee went on to state that "[a] federal limitations period, appropriately tailored to the unique circumstances of Holocaust-era claims, is therefore needed to guarantee that the United States fulfills the promises it has made to the world to 'facilitate just and fair solutions with regard to Nazi-confiscated and looted art' and to 'make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims.'" *Id.* at 5–6 (quoting Terezin Declaration).

These observations were incorporated into the Act's findings, which summarize the history of efforts to restore artworks to their rightful owners following World War II and the difficulties encountered by victims and their heirs in pursuing claims in court. Those findings expressly note the "significant procedural obstacles partly due to state statutes of limitations" that plaintiffs had encountered and conclude that "a federal law is necessary to ensure that claims to Nazi-confiscated art are adjudicated in accordance with United States policy as expressed in the Washington

Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration." HEAR Act of 2016 §2(6), (7).

## IV. Courts continued to dismiss claims without reaching the merits

Although the HEAR Act provided a uniform federal statute of limitations, plaintiffs continued to encounter non-merits obstacles when seeking adjudication of restitution actions. For example, in *Zuckerman v. Metro. Museum of Art*, the U.S. Court of Appeals for the Second Circuit affirmed the dismissal of an artwork restitution claim based on the equitable defense of laches. 928 F.3d 186, 196 (2d Cir. 2019). In *Cassirer v. Thyssen-Bornemisza Foundation*, 89 F.4th 1226 (9th Cir. 2024), the U.S. Court of Appeals for the Ninth Circuit affirmed dismissal of a claim to recover a painting by Camille Pissarro, despite the undisputed fact that Nazis had stolen it, on the ground that the present possessor of that painting had acquired prescriptive title to the work. *Cassirer*, 89 F.4th at 1229–30. Other restitution claims were blocked by the act of state doctrine, *Von Saher v. Norton Simon Museum*, 897 F.3d 1141, 1143 (9th Cir. 2018) (*Von Saher II*), and *forum non conveniens*, *Est. of Kainer v. UBS AG*, 37 N.Y.3d 460, 464 (2021).

In short, the U.S. legal system was producing results contrary to the U.S. policy expressed in the Washington Conference Principles, the Terezin Declaration, and the 2016 HEAR Act, that claims for the restitution of Nazi-confiscated art be resolved not on time-based or other non-merits grounds, but "on the facts and merits."

## V. Congress responds by amending the HEAR Act

Congress responded to these decisions by amending the HEAR Act to expressly preclude defenses based on the passage of time, *e.g.*, laches, adverse possession, acquisitive prescription, usucapion, and other non-merits discretionary defenses, *e.g.*, act of state, international comity, *forum non conveniens*, and prudential exhaustion. Pub. L. 119-82, §2(a)(3)(G) (adding new subsection (f) to section 5 of the HEAR Act). Congress also removed a provision that would have

had the Act sunset on January 1, 2027, *id.* §2(a)(3)(A), and added a provision allowing for nationwide service of process, *id*. §2(a)(3)(G) (adding new subsection (g) to section 5), and a provision deeming covered claims to involve rights in violation of international law for purposes of section 1605(a)(3) of the Foreign Sovereign Immunities Act, *id*., §2(a)(3)(D) (adding new subsection (b) to section 5). Congress made these amendments in furtherance of its finding that certain post-HEAR Act cases had "frustrated the intent of this Act[,]" which is "to permit claims to recover Nazi-looted art to be brought, notwithstanding the passage of time since World War II[,]" by "dismissing recovery lawsuits in reliance on defenses based on the passage of time … or on other non-merits discretionary defenses." *Id.*, §2(a)(1)(B) (adding new paragraph (8) to findings in section 2).

## ARGUMENT

Defendants argue that the HEAR Act as amended is unconstitutional because it violates the Tenth Amendment and offends separation-of-powers principles. They are wrong on both counts. The HEAR Act is a valid exercise of Congress' War and Commerce Clause powers that preempts state statutes of limitations and prescribes other rules of decision, but does not commandeer state political authorities or otherwise run afoul of the Tenth Amendment. And the Act does not encroach on the judicial function in breach of the separation of powers, because it establishes rules of decision but does not dictate the outcome of particular cases.

### I. The HEAR Act does not violate the Tenth Amendment

Article I, Section 8 of the Constitution enumerates the powers of Congress. Among those are powers regarding war and national defense, the power to regulate interstate and foreign commerce, and the power to "make all laws which shall be necessary and proper for carrying into Execution" the other enumerated powers. The Tenth Amendment to the Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States,

are reserved to the States respectively, or to the People." U.S. Const. amend. X. In *New York* v. *United States*, the Supreme Court explained the division between federal and state power as follows: "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." 505 U.S. 144, 156 (1992) (collecting cases). Applying that principle, Defendants' Tenth Amendment challenge to the HEAR Act fails.

In the HEAR Act, Congress exercised powers granted to it by Article I, Section 8 to deal with matters that are quintessentially and exclusively federal in nature, including matters related to war, foreign affairs, foreign commerce, and interstate commerce. The Act expresses Congress' will to remedy the persistent consequences of wartime theft of personal property, which property continues to move in international and interstate commerce. The Act thus does not encroach on matters reserved to the states under the Tenth Amendment.

Implicitly conceding this, Defendants do not refer to either the absence of power delegated to Congress or the presence of a reserved attribute of state sovereignty as a constitutional bar to the HEAR Act. Instead, they invent a new test for Tenth Amendment consistency and then assert that the Act fails that test. According to Defendants, Congress may not "impose preemptive procedural rules" that are not "part and parcel" of "substantive federal rights and remedies." ECF 191 ("MTD") at 13. That framing mischaracterizes what the HEAR Act does and lacks any basis in the text of the Tenth Amendment or related jurisprudence.

The Act does not impose a preemptive procedural rule. Rather, it prescribes a substantive rule of decision directing courts in cases involving allegations of Nazi-confiscated artwork to apply an actual-discovery limitations rule and disallow certain non-merits defenses. Defendants state that the Act "provides *no* substantive federal rights or remedies," MTD at 13, implying that because

the Act does not establish a federal cause of action it must be purely procedural in nature. But Defendants misconstrue the distinction between procedure and substance. A statute need not create a new cause of action to be substantive in nature. If a statute "alters 'the rules of decision by which the court will adjudicate [litigants'] rights'"—as the HEAR Act does—"it is substantive." *Corley v. United States*, 11 F.4th 79, 86 n.3 (2d Cir. 2021) (quoting *Mississippi Publishing Corp. v. Murphee*, 326 U.S. 438, 446 (1946) (cleaned up)).

Moreover, even if the HEAR Act's prescriptions were procedural in nature, Defendants' argument that they would survive Tenth Amendment scrutiny only if they were "part and parcel" of "substantive federal rights and remedies," MTD at 13, still would be incorrect. Defendants purport to draw that proposition from *Dice v. Akron, C & Y.R. Co.*, 342 U.S. 359 (1952) and *Felder v. Casey*, 487 U.S. 131 (1988). But neither *Dice* nor *Felder* dealt with the question of when federal law preempts state law. Rather, they dealt with the distinct and unrelated question of which procedural rules apply when certain federal causes of action are heard in state court. That issue has nothing to do with the matter at hand.

### A. The HEAR Act is a valid exercise of Congress' enumerated powers

The HEAR Act is an exercise of powers assigned to Congress in Article I of the Constitution: (1) the war power; and (2) the Commerce Clause powers.[7] *See* U.S. Const. art. I, § 8, cls. 3, 11–16.

[7] As the Ninth Circuit noted in *Von Saher*, the federal government has exclusive authority to regulate with regard to claims to recover Nazi-looted art because such claims undeniably implicate foreign commerce and foreign affairs. *See Von Saher*, 592 F.3d at 967 ("The recovery of Holocaust-era art affects the international art market, as well as foreign affairs.").

### 1. The HEAR Act is an exercise of Congress's war power

The Constitution authorizes Congress to "provide for the common defense" through enumerated powers pertaining to war and national security. The federal government's war power is set forth in "many broad, interrelated provisions" and is in effect a near complete delegation of authority over war-related matters to the federal government. *Torres v. Texas Dept. of Public Safety*, 597 U.S. 580, 589–91 (2022).

The Supreme Court has long read these provisions in conjunction with the Necessary and Proper Clause as vesting in Congress not just the power to declare war and appropriate money to support the military, but also "the power 'to remedy the evils which have arisen from [war's] rise and progress' . . . ." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 141 (1984) (quoting *Hamilton v. Kentucky Distilleries and Warehouse Co.*, 251 U.S. 146, 161 (1919)); *Stewart v. Kahn*, 78 U.S. 493, 507 (1870). This principle—that Congress' power to declare and support the waging of war necessarily implies the power to remedy the effects of war—is supported by a long line of cases in which the Supreme Court upheld legislation applicable in a war's aftermath to address problems caused by the war. *See, e.g.*, *Stewart*, 78 U.S. at 507 (upholding statute tolling state statutes of limitations when courts were largely unavailable to litigants due to the Civil War); *Hamilton*, 251 U.S. at 161 (upholding wartime prohibition law after armistice with Germany); *Lichter v. United States*, 334 U.S. 742, 792–93 (1948) (upholding act authorizing recovery of excessive wartime profits by the United States); *Woods*, 333 U.S. at 141 (upholding rent-stabilization law targeting post-war housing crisis).

The Supreme Court consistently has recognized that Congress's power to remedy the effects of war "does not necessarily end with the cessation of hostilities." *Woods*, 333 U.S. at 141. In *Woods*, for example, the Court rejected a constitutional challenge to Title II of the Housing and Rent Act of 1947, which imposed rent controls to address a housing deficit greatly exacerbated by

rapid demobilization after World War II and the reduction in domestic construction during the war. *See id.* at 139–143. The Supreme Court found that the legislative history of the challenged statute made "abundantly clear" that the housing deficit—which "in considerable measure" was caused by the war effort—had not yet resolved and held that Congress had the power, even after the cessation of hostilities, to act to abate the consequences that follow from a short supply of housing exacerbated by the war. *Id.* at 141–42. According to the Court, to hold otherwise would "drastically limit[]" the Necessary and Proper Clause as applied to the various war powers, rendering Congress "powerless" to remedy the conditions that inevitably result from war. *Id.* at 143.

The well-established proposition that Congress has the power to remedy the consequences of war supports its enactment of the HEAR Act. The historical foundations for the Act—the Washington Conference Principles and the Terezin Declaration—reflect the United States' commitment to remediation of the Nazis' wartime atrocities, including the mass expropriation of Jewish property. And it is evident from the Act's history that, despite the federal government's longstanding policy favoring restitution, the devastating impact of Nazi confiscation of art persists. *See* discussion of legislative history, *supra* pp. 11–13. The HEAR Act targets what Congress has determined—on the basis of testimony from victim representatives and restitution and recovery experts[8]—to be a major roadblock to the remediation of that war-related injustice: the application of time-based and other non-merits defenses to claims to recover the expropriated art. HEAR Act, § 2(6) ("Those seeking recovery of Nazi-confiscated art must painstakingly piece together their

[8] *S. 2763, the Holocaust Expropriated Art Recovery Act – Reuniting Victims with Their Lost Heritage: Hearing on S. 2763 Before the Subcomms. On the Constitution and on Oversight, Agency Action, Federal Rights and Federal Courts of the S. Comm. On the Judiciary*, 114th Cong. (2016); S. Rep. No. 114-394, at 6 (2016); 172 Cong. Rec. H2497 (daily ed. Mar. 16, 2026).

cases from a fragmentary historical record ravaged by persecution, war, and genocide … [which] often cannot be done within the time constraints imposed by existing law.”).

Much like the Reconstruction-era tolling statute upheld in *Stewart v. Kahn*, 78 U.S. at 507, the HEAR Act “promotes justice and honesty” by reopening the courts to those persons whose efforts to vindicate their legal rights were otherwise frustrated by the interference of war, the catastrophic loss of life, and the (often covert) trafficking in stolen property during and after the war. As in *Stewart*, the Act is a “beneficent exercise,” *id.*, of Congress’ war power, enacted to enable redress of one of the lingering consequences of World War II,[9] and thus sits comfortably within Congress’ constitutional authority.

### 2. The HEAR Act also is an exercise of Congress’s power to regulate foreign and interstate commerce

In addition to an exercise of Congress’ war power, the HEAR Act is an exercise of its authority to regulate foreign and interstate commerce. Indeed, that was the authority cited by the Act’s sponsor in the House upon introduction in 2016. *See* 162 Cong. Rec. H5865 (Sep. 22, 2016) (Constitutional Authority Statement for H.R. 6130). The Commerce Clause empowers Congress to regulate the channels and instrumentalities of interstate and international commerce, as well as activities with a substantial effect on that commerce. *See United States v. Lopez*, 514 U.S. 549, 558–59 (1995); *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005); *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 200 (2d Cir. 2002) (“In determining whether Congress has exceeded its authority under the Commerce Clause, we may look to … whether there are discernible ties to commerce, whether the type of activity as a whole has an effect on commerce, and what congressional findings have been made with respect to the activity’s effects on commerce.”). A federal statute falls within

[9] *See also Federal Republic of Germany v. Philipp*, 592 U.S. 169, 186 (2021) (recognizing the HEAR Act as part of Congress’ broader legislative framework to address Nazi-era property restitution).

Congress' authority under the Commerce Clause if Congress had a "rational basis" for concluding that the regulated activities, "taken in the aggregate, substantially affect interstate commerce in fact." *Raich*, 545 U.S. at 22 (collecting cases).[10] In this case, that condition is easily met.

The art market is a multi-billion-dollar interstate and international commercial enterprise, and Nazi-confiscated art makes up a significant part of that market. The Nazis seized or forcibly sold more than 650,000 artworks, including art by some of the most celebrated and sought-after artists in history, resulting in what has been described as the "greatest displacement of art in human history." HEAR Act, § 2(1); *see Nazi-Era Looted Art Research and Restitution*, It's Art Law, https://itsartlaw.org/nazi-era-looted-art-research-and-restitution/ (last visited Aug. 19, 2026). The HEAR Act targets the transfer of these valuable commercial and cultural assets by establishing the rules applicable in the principal U.S. fora for adjudicating their legal ownership: state and federal courts. State time-based and other non-merits defenses that prevent adjudication on the merits affect provenance certainty and the marketability of Nazi-looted artworks.[11] Establishing a rule of

---

[10] Although these authorities concern interstate commerce, the same principles apply to foreign commerce. As the Third Circuit recently observed, there is "strong evidence that Congress has more expansive power under the Foreign Commerce Clause than the Interstate Commerce Clause." *See, e.g., United States v. Clay*, 128 F.4th 163, 177 (3d Cir. 2025) (applying the *Lopez* framework to a Foreign Commerce Clause challenge).

[11] This is because the litigation terminates before a determination is made of who legally owns the artwork at issue. Although a time-barred claim is "resolved" from the perspective of the court hearing it, it is not "resolved" from the perspective of the art market, and disputed title can preclude access to legitimate markets. *See* Ralph E. Lerner & Judith Breser, *Art Law: The Guide for Collectors, Investors, Dealers, & Artists 4th Edition,* New York: Practicing Law Institute, 2012, Appendix 4-4, pg. 403 (Sotheby's and Christie's standard consignment agreements requiring consignor to warrant she is passing clear title); *Bakalar*, 619 F.3d at 139 (describing how dispute over ownership of Nazi-confiscated work of art had resulted in withdrawal of winning bid at a Sotheby's auction).

decision directing courts in most instances to reach the merits helps to overcome those problems and therefore has a clear and rational link to the interstate and international art market. As such, Congress acted well within its authority to "make all Laws which shall be necessary and proper" to "regulate Commerce with foreign Nations, and among the several States." U.S. Const., Art. I, § 8.

**B. The HEAR Act does not implicate the anticommandeering doctrine**

The HEAR Act is also consistent with the division of sovereign powers between the federal government and the states and thus does not violate the Tenth Amendment. The Supreme Court has explained that the limitation on federal legislative authority set forth in the Tenth Amendment prohibits Congress from enacting legislation that in effect "issue orders directly to the States" (a prohibition sometimes referred to as the "anticommandeering doctrine"). *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 470–71 (2018); *see also Printz v. United States*, 521 U.S. 898, 935 (1997) (Congress may "no[t] command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").

The HEAR Act respects that limitation. It does not compel state legislatures to regulate on behalf of a federal interest, *see New York v. United States*, 505 U.S. at 161 (citing *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981)), conscript state executive officers to administer a federal program, *see Printz v. United States*, 521 U.S. 898, 935 (1997), or prohibit states from enacting affirmative legislation, *see Murphy*, 584 U.S. at 474 (2018). The HEAR Act instead creates a federal rule of decision applicable in state and federal courts through the Supremacy Clause, which is the paradigm of lawful preemption.

## II. The HEAR Act does not violate separation-of-powers principles

In addition to challenging the HEAR Act under the Tenth Amendment, Defendants challenge it on separation-of-powers grounds, arguing that it "unconstitutionally intrudes on the jurisdiction of the federal courts." MTD at 14. This defense, too, misconstrues the Act and must fail.

Article III of the Constitution provides for "an independent Judiciary, a Third Branch of Government with the 'province and duty … to say what the law is' in particular cases and controversies." *Bank Markazi v. Peterson*, 578 U.S. 212, 225 (2016) (quoting *Marbury vs. Madison*, 1 Cranch 137, 177 (1803)). To maintain that independence and protect the separation of powers that independence requires, the Supreme Court has declared "off limits" to Congress certain categories of legislation: (1) laws "vest[ing] review of the decisions of the Article III courts in officials of the Executive Branch[]," *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995); (2) laws "retroactively commanding the federal courts to reopen final judgments[,]" *id.* at 219; and (3) laws "direct[ing] the result [of a case] without altering the legal standards governing [the case,]" *Bank Markazi*, 578 U.S. at 228 (first citing *Klein*, 13 Wall., at 147, then citing *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429 (1992)). The HEAR Act does not involve the Executive Branch at all, except insofar as it implements the Executive Branch's international relations policies, *see supra* p. 8–10. Nor does it command federal courts to reopen any final judgments. Defendants appear to be arguing that the HEAR Act falls into the third "off limits" category by "unconstitutionally intrud[ing] on the jurisdiction of the federal courts to 'decide' cases after their equitable jurisdiction has otherwise been fully vested." *See* MTD at 14. The Act does no such thing; it merely establishes new rules of decision for courts to apply in covered cases.

### A. The HEAR Act changes applicable law; it does not prescribe an outcome in any given case

As the Supreme Court held in *Bank Markazi v. Peterson*, 578 U.S. 212 (2016), "a statute does not impinge on judicial power when it directs courts to apply a new legal standard to undisputed facts." 578 U.S. at 230; *see also Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 441 (1992); *Plaut*, 514 U.S. at 218. By establishing a six-year actual-discovery limitations rule and categorically eliminating certain time-based and other non-merits defenses, the HEAR Act supplies new legal standards for the courts to apply to pending and future claims seeking to recover Nazi-confiscated artwork. *See Plaut*, 514 U.S. at 218 (statute retroactively applying new limitations period to otherwise time-barred private securities fraud actions supplied a new legal standard). The Act does not direct which party wins, compel any particular factual findings, or reopen final judgments. It simply establishes new substantive legal standards designed to ensure that courts resolve the subject claims on the merits, notwithstanding the passage of time. As such, it does not violate the separation of powers.

### B. Elimination of equitable defenses does not breach separation of powers

In a single sentence, Defendants assert that the HEAR Act's "elimination of equitable defenses . . . intrudes on the jurisdiction of the federal courts to 'decide' cases . . . ." MTD at 14. That unsupported assertion confuses a legitimate exercise of Congress' legislative power with one that encroaches on the independence of the judiciary.

The scope of jurisdiction of the federal courts over suits in equity was defined by statute (*i.e.*, the Judiciary Act of 1789). *See Grupo Mexicano de Desarrollo v. All. Bond Fund*, 527 U.S. 308, 318 (1999) (tracing the content of federal equitable jurisdiction to the Judiciary Act of 1789). As such, it may be modified by statute. *See* John Harrison, *Federal Power and Federal Equity Without Federal Equity Powers*, 97 N.D. Law Rev. 1911, 1912 (2022) ("The Constitution does not itself

adopt, incorporate, or receive principles of equity in a way that would limit Congress's power to alter those principles."). The Supreme Court has long recognized Congress' authority to alter the courts' equitable powers in service of a constitutionally permissible legislative objective, subject only to the requirement that it does so clearly. *See, e.g.*, *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (recognizing courts' authority to exercise equitable powers "[u]nless otherwise provided by statute"); *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 593 U.S. 67, 79 (2021) ("[T]he text and structure of the statutory scheme at issue can, 'in so many words, or by a necessary and inescapable inference, restric[t] the court's jurisdiction in equity.'" (internal citations omitted)).

In prescribing that certain equitable defenses may not be applied to timely filed claims to recover Nazi-confiscated art, the HEAR Act does nothing more than define courts' equitable jurisdiction in a manner that the Supreme Court consistently has found to be permissible.[12] It does not entail Congress encroaching on the independence of the federal judiciary.

**CONCLUSION**

For the foregoing reasons, the motion to dismiss should be denied.

Dated: September 18, 2026

*/s/ Theodore R. Posner*

Theodore R. Posner
Virginia Fergusson (*pro hac vice* forthcoming)

[12] The HEAR Act is not unique in this regard. Other instances of Congress circumscribing courts' equitable jurisdiction include: the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115 (no labor injunctions); the Tax Injunction Act, 28 U.S.C. § 1341 (no power to enjoin state tax collection); the Prison Litigation Reform Act, 18 U.S.C. § 3626 (restrictions on prospective equitable relief in prison cases); and the Anti-Injunction Act, 28 U.S.C. § 2283 (no power to enjoin certain state court proceedings).

BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, DC 20001
Tel: (202) 639-7700
Fax: (202) 639-7890
theodore.posner@bakerbotts.com
virginia.fergusson@bakerbotts.com

*Counsel for Amici United States Senators Richard Blumenthal and John Cornyn*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing contains 6,386 words, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c) and the Individual Practices of Judge John G. Koeltl dated March 17, 2025 ("Individual Practices"). The undersigned relied on the word count of the word-processing program used to prepare this document. The brief conforms and adheres to all formatting rules under Rule III.D of the Individual Practices.

*/s/ Theodore R. Posner*
Theodore R. Posner